IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

HAL W. STANLEY and MICHELLE
STANLEY, each individually and on behalf
of B.S., J.S., G.S., P.S., C.S., and V.S., as
parents and legal guardians                                                    PLAINTIFFS


v.                                         NO. 6:17-CV-06008


KATHERINE FINNEGAN, in her Individual Capacity;
GARLAND COUNTY; MIKE MCCORMICK,
in his Official Capacity; MIKE WRIGHT, Individually and
in his Official Capacity; JASON LAWRENCE,
Individually and in his Official Capacity;
TERRY THREADGILL, Individually and in his
Official Capacity                                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

On January 12, 2015, the seven minor children of Hal and Michelle Stanley were

removed from their home by law enforcement officials due to allegations of child abuse.  The

primary allegation related to the involvement of a chemical substance known as Miracle Mineral

Supplement ("MMS").[1]  MMS contains twenty-eight percent sodium chlorite and is similar to

bleach.  Two non-family complainants and an older child (who was no longer a minor) reported

Hal had exposed the children to MMS by encouraging the children to consume it and by

diffusing the chemical throughout the home's ventilation system.  During the execution of a

search warrant at the Stanley's home, the two oldest minor children confirmed the allegations of

MMS exposure.  Consequently, Sergeant Michael Wright placed the seven children in DHS

custody under a seventy-two-hour protective hold.  The children remained in DHS custody for

---

[1] MMS is also known as Miracle Mineral Solution.

nearly five months under a variety of family court orders. Hal and Michelle regained full custody by June 2015.

The Stanleys filed this lawsuit on January 13, 2017, alleging their constitutional rights were violated when the children were removed from Hal and Michelle's custody. Pending before the Court are three motions for summary judgment filed on September 12, 2019. The motions were filed by: Defendant Katherine Finnegan, in her individual capacity (ECF No. 89); Defendants Garland County, Mike McCormick, in his official capacity as Sheriff for the Garland County Sheriff's Department ("GCSD"), Mike Wright, individually and in his official capacity as sergeant for GCSD, Jason Lawrence, individually and in his official capacity as chief deputy for GCSD, and Terry Threadgill, individually and in his official capacity as corporal for GCSD (ECF No. 92); and Hal and Michelle Stanley, individually and on behalf of six of the minor children. (ECF No. 95). These matters are now ready for consideration.

The task of this Court is not to determine the ultimate question of whether child abuse actually occurred. This case is essentially a question of whether—based on the undisputed material facts in the record—it was objectively reasonable for law enforcement officials to remove the Stanley children from the custody of their parents on the night of January 12, 2015. This inquiry is sensitive and requires the Court to carefully examine competing interests in two delicate subjects: Hal and Michelle Stanley's fundamental liberty interests in keeping their family together, and the State's compelling interest in preventing child abuse. Upon review of the motions, responses, replies, the arguments and supporting documents contained therein, and all other related filings, the Court finds there was a reasonable suspicion of child abuse on the night the children were removed. The Defendants are thereby entitled to the protections of qualified immunity.

Accordingly, the motions for summary judgment filed by the Defendants (ECF Nos. 89 & 92) are GRANTED. The cross motion filed by the Stanleys (ECF No. 95) is DENIED.

## II.     BACKGROUND

### A.  The Stanleys

Life in the Stanley family centered around the home. During the relevant time period, the Stanley home consisted of Hal, Michelle, and their seven minor children. The Stanleys call themselves devoutly religious, and they have resided on the same property for approximately twenty years. Hal grows much of the family's food in a home garden and claims to generate his income through conducting an internet-based ministry. Michelle is responsible for raising, feeding, and educating their children. Michelle educates the children in a home-schooled environment. The Stanleys acknowledge that during the events at issue, tensions had developed with their son, J.S., in part, because of his desire to attend public schools.

### B.  Miracle Mineral Supplement ("MMS")

MMS is a bleach-like, liquid chemical. MMS is composed of twenty-eight percent sodium chlorite. Since 2010, federal agencies have warned consumers about the dangers of ingesting MMS.[2] Complications resulting from consumption can include nausea, severe vomiting, diarrhea, and symptoms of severe dehydration and acute liver failure.[3] Despite these risks, distributors and advocates advertise MMS as providing health restoration benefits.[4] It is apparent that MMS is promoted as a medicine to help cure various diseases and conditions,

---

[2] *FDA warns consumers about the dangerous and potentially life threatening side effects of Miracle Mineral Solution*, FDA, Aug. 12, 2019, https://www.fda.gov/news-events/press-announcements/fda-warns-consumers-about-dangerous-and-potentially-life-threatening-side-effects-miracle-mineral.

[3] *Id*.; *Danger: Don't Drink Miracle Mineral Solution or Similar Products*, FDA, Aug. 12, 2019, https://www.fda.gov/consumers/consumer-updates/danger-dont-drink-miracle-mineral-solution-or-similar-products#:~:text=Danger%3A%20Don't%20Drink%20Miracle%20Mineral%20Solution%20or%20Similar%20Products,products%20can%20make%20you%20sick.&text=If%20you're%20drinking%20%E2%80%9CMiracle,sodium%20chlorite%20products%2C%20stop%20now.

[4] *See generally* Genesis II Church of Health and Healing, https://genesis2church.ch/ (last visited Mar. 6, 2020).

ranging from cancer, HIV/AIDS, malaria, autism, the common cold, arthritis, high cholesterol, and acid reflux.[5]  In the present case, the Stanleys insist that Hal used "MMS as a natural remedy to promote his own health" and to balance the pH in the family's aquaponics system.  (ECF No. 105-3, Michelle Stanley Aff., at 17, Oct. 21, 2019).  Hal and Michelle deny that they forced their children to drink MMS.

### C.  Initial Allegations

On January 9, 2015, two complainants reported allegations of abuse and neglect within the Stanley home.  (ECF No. 89-1, Wright Aff., at 1-2, Jan. 15, 2015).[6]  The complainants identified themselves as neighbors and friends of the Stanley family.  They provided their allegations in-person to Sergeant Michael Wright and Corporal Russell Rhodes, an Arkansas State Police Investigator.  The complainants claimed that Hal tried to force the children to drink MMS.  They asserted that when the children refused, Hal heated and diffused MMS throughout the home's ventilation system.  The complainants further claimed the children were suffering from nausea and severe headaches as a result of MMS exposure.  They also claimed that Hal kept a container of MMS within the family's refrigerator.  Furthermore, the complainants reported allegations of excessive corporal punishment, medical neglect, inadequate nutrition, and educational neglect.

### D.  Interview with C.S.

Wright and Rhodes also interviewed C.S. on January 9th, shortly after they spoke with the original complainants.  (ECF No. 89-1, Wright Aff., at 2-3, Jan. 15, 2015).  C.S., the adult

---

[5] *See, e.g.*, *A Word from Jim Humble*, JIM HUMBLE, https://jimhumble.co/ (last visited Mar. 6, 2020).
[6] Earlier allegations of abuse had been provided against the Stanleys in December 2014, based on inadequate clothing and the striking of a child.  DHS investigators determined these allegations were unsubstantiated.  Despite this fact, the Court emphasizes that a prior unsubstantiated allegation does not automatically indicate the merit, or lack thereof, of subsequent allegations.  "Child abuse is a crime and suspected child abuse should be investigated with due diligence."  Ark. Code Ann. § 12-8-501(a)(4).

son of Hal and Michelle, moved out of the Stanley home in December 2014.  C.S. confirmed that

Hal "experimented" with MMS.  He denied that Hal forced the children to drink MMS, but he

asserted that his father had encouraged the children to drink it.  C.S. also confirmed Hal had

diffused MMS throughout the home's ventilation system.  C.S. believed, however, that Hal had

stopped this activity.  C.S. further claimed that Hal's physical discipline was excessive.  C.S.

feared that Hal would unintentionally hurt one of the children while he was on a "chemical

kick."

### E.  MMS Bottle and Handwritten Notes

Three days later, on January 12, 2015, the two original complainants gave Sergeant

Wright a small plastic bottle containing MMS.  (ECF No. 89-1, Wright Aff., at 4-5, Jan. 15,

2015).  The complainants stated one of the children took the bottle out of the home during the

previous weekend.  Wright stated the bottle "emitted a strong smell" and "seemed like bleach."

The complainants also provided Wright with handwritten notes apparently written by two of the

children.  According to Sergeant Wright, the notes reiterated the complainants' original

allegations.  The notes discussed the children's exposure to MMS, physical abuse within the

home, insufficient medical attention, inadequate education, inadequate nutrition, and excessive

corporal punishment.

### F.  Obtaining a Search Warrant

Later on January 12th, Wright conducted a meeting with various law enforcement and

investigative officials.  The participants included representatives from the local prosecutor's

office, the Arkansas State Police, and the Garland County Sheriff's Department.  Defendant

Katherine Finnegan, an Arkansas State Police Investigator, also participated in the meeting.  The

meeting resulted in Wright's decision to seek a warrant to conduct a search within the Stanley's

home.  Wright submitted an affidavit in support of his request.  The affidavit emphasized the children's potential and possible exposure to MMS.  The Honorable Lynn Williams, Garland County Circuit Judge, immediately approved Wright's request.  The warrant authorized Wright and his team to search the Stanley home for MMS on the basis that it could endanger the welfare of the children.

### G.  Investigations at the Stanley Home

Sergeant Wright and other law enforcement officers arrived at the Stanley residence around 4:47 PM on January 12, 2015.  Finnegan arrived around the same time.  Wright was in charge of the criminal investigation, and Finnegan oversaw the child maltreatment investigation.  Search participants included officers from the Garland County Sheriff's Department, the Garland County Drug Task Force, and the Arkansas State Police.  An ambulance and a physician were onsite throughout the search.  Officials from DHS's Child and Family Services Division were also present.  In total, approximately thirty law enforcement and investigative officials were present during the search.

### 1.  Finnegan's Interviews with J.S. and V.S.

Finnegan interviewed J.S. and V.S. during the earlier stages of the search.  J.S. and V.S. were the Stanley's two oldest minor children at this time.  J.S. was sixteen years old, and V.S. was fourteen.  Sergeant Wright was present during some portions of the interviews but did not participate in questioning the two children.  (ECF No. 106-1, Finnegan Dep. 149:8-16, Jan. 31, 2019).  Finnegan interviewed the five remaining children after Sergeant Wright placed them in DHS custody.  Finnegan did not interview Hal and Michelle prior to the children's removal.[7]

---

[7] Finnegan states it was not her custom to interview alleged offenders at the home during the course of a child abuse investigation.  (ECF No. 59-7, Finnegan Test. 80:21-23, Jan. 21, 2015).

Finnegan interviewed J.S. at approximately 5:24 PM. J.S. primarily reported concerns about the use of MMS in the home. Similar to C.S., J.S. claimed Hal had diffused MMS throughout the home's ventilation system. Specifically, J.S. said that Hal placed a coffee maker containing MMS next to a fan and used the fan to pump the chemical throughout the vents. J.S. further accused Hal of applying MMS on the face of one of his younger siblings in order to remove a mole. He also accused Hal of making a sibling drink MMS when the sibling was sick with a 103-degree fever. J.S. said he was never forced to drink MMS, but he claimed the smell caused his throat to burn. J.S. also talked about physical abuse in the home. He accused Hal of grabbing him by the throat and pushing him against a wall. Lastly, J.S. said that if he and his siblings remained at the home after the search, his parents would immediately flee with the children to another location.

Finnegan interviewed V.S. around 6:00 PM. V.S.'s allegations mirrored the allegations provided by J.S. V.S. reported that she had never been forced to drink MMS, but her father had encouraged the children to drink it. She confirmed that Hal attempted to use MMS in order to remove a mole from a sibling's face. Furthermore, V.S. confirmed J.S.'s allegation regarding the family's potential to flee to another location.

## 2. Flight Risk

The potential to flee is one of the health and safety factors that investigators look at in determining whether to remove a child. (ECF No. 89-4, Braswell Dep. 31:6-8, March 12, 2019). After Finnegan interviewed J.S. and V.S., she examined the family's van and concluded the vehicle appeared as if it were packed for purposes of flight. (ECF No. 89-3, Finnegan Dep. 79:11-25, Jan. 31, 2019). Finnegan insists the van contained boxes, clothes, and tents. Tom Braswell, a DHS Investigator, observed that some of these items were present, but he claims the

van did not appear to be packed for flight. (ECF No. 94-5, Braswell Dep. 29:19-25, March 12, 2019). The Stanleys state the van contained camping materials, but they assert it was not "packed full" nor was it packed for purposes of flight. (ECF No. 105, Pls.' Resp., at 6).

### 3. Search of the Home

Sergeant Wright, Corporal Terry Threadgill, and Finnegan conducted a walkthrough of the Stanley's house. The walkthrough confirmed the presence of MMS inside the home. The family's refrigerator contained an open container marked as "MMS." A bathroom also contained a smaller marked MMS bottle. Sergeant Wright insists he immediately smelled bleach upon entering the home. Wright states that within ten minutes of his entry, he began to experience a "slight headache" and "noticed a slight tingle in [his] lips and throat." (ECF No. 94-1, Wright Aff. ¶¶ 23-24, Sept. 12, 2019). Wright claims that other officers experienced similar symptoms. (*Id*. ¶ 25). Finnegan testified in family court proceedings that she endured a headache shortly after entering the home. (ECF No. 59-7, Finnegan Test. 86:2-5, Jan. 21, 2015). While testifying in other settings, however, she asserts she did not smell anything that raised her concerns. (ECF No. 59-8, Finnegan Test. 10:1-7, Dec. 2, 2015; *see also* ECF No. 106-1, Finnegan Dep. 100:23, Jan. 31, 2019).

### 4. Medical Consultations

The children were evaluated by a physician, Patrick Kennedy, during the course of the search. Dr. Kennedy reported that none of the symptoms associated with poisoning were readily apparent, but he recommended that the children be sent to a medical facility for further testing. Finnegan and her supervisor, Michelle Gatlin, contacted Dr. Teresa Esquivel to gather medical information about MMS exposure. (*See* ECF No. 59-7, Finnegan Test. 74:19-23, Jan. 21, 2015). Dr. Esquivel, a pediatrician with Arkansas Children's Hospital, informed them that the

consumption of MMS could lead to serious health issues. (ECF No. 89-6, Gatlin Dep. 107:20-25, March 11, 2019). Dr. Esquivel said the type of exposure described by J.S. and V.S. could cause pulmonary problems, renal failure, or even death. (*Id*. at 107:20-25, 109:3-17). Like Dr. Kennedy, Esquivel recommended the children be examined for further testing at a medical facility.

### 5. DHS Safety Assessment

Gatlin requested a DHS safety assessment during the middle stages of the search. Tom Braswell oversaw the assessment and ordered Lenny Robinson to interview the Stanley family, Wright, and Finnegan. (ECF No. 89-4, Braswell Dep. 132:13-17, March 12, 2019; ECF No. 94-5, Braswell Dep. 7:11-15, March 12, 2019). Braswell states Robinson was unable to make substantial progress on the assessment "because he didn't want to interfere" with the investigations led by Wright and Finnegan. (ECF No. 89-4, Braswell Dep. 132:7-9, March 12, 2019). Braswell and Robinson did not complete the assessment prior to Wright's decision to remove the children. (*See id*. at 81:9-10).

### 6. Removal of the Children

The children were removed from the home at approximately 8:00 PM on the night of January 12th. (ECF No. 89-2, Finnegan Aff., at 3, Jan. 16, 2015). Wright placed the children in DHS custody under a seventy-two-hour protective hold.[8] He made the decision based upon Finnegan's recommendation and under the belief that DHS investigators were not going to remove the children from the scene. (ECF No. 89-1, Wright Aff., at 5, Jan. 15, 2015; ECF No. 94-2, Wright Aff. ¶ 45, Sept. 12, 2019). Wright claims that he deferred determinations of the

---

[8] Wright had the authority to remove the children under the Arkansas Child Maltreatment Act. The Act states that a police officer or law enforcement official can take a child into custody when there are circumstances or conditions that present "an immediate danger to the health or physical well-being of the child." *See* Ark. Code Ann. § 12-18-1001(a)(3).

children's credibility to Finnegan.  (ECF No. 95-3, Wright Dep. 95:6-8, Feb. 22, 2019).  In recommending removal, Finnegan has categorized her primary concerns as the presence of MMS in the home and the family's potential to flee.  (ECF No. 52-7, Finnegan Test. 62:6-7, Dec. 12, 2015).

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  The inquiry to be performed is "the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  A fact is material when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.  The moving party bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Id.*  If this burden is met, the nonmoving party must come forward with specific facts establishing a genuine issue for trial. *Krenik*, 47 F.3d at 957.  It is not the role of the Court to make determinations of credibility; instead, the Court determines if there are any disputed issues and whether those issues are both genuine and material. *See Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987).

When a court confronts cross motions for summary judgment, it views the record in the light most favorable to the plaintiff when considering the defendant's motion, and the court

views the record in the light most favorable to the defendant when reviewing the plaintiff's motion. *Weber v. Travelers Home & Marine Ins. Co.*, 801 F. Supp. 2d 819, 825 (D. Minn. 2011). The presentation of cross motions for summary judgment does not mandate a court to grant summary judgment in favor of one side and against the other. *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1076 (8th Cir. 2014). The filing of cross motions for summary judgment "does not mean that the parties have waived their right to trial." *Thompson-Harbach v. USAA Federal Savings Bank*, 359 F.Supp.3d 606, 615 (N.D. Iowa 2019) (citing *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)).

## IV. DISCUSSION

At this stage in the proceedings, the Stanleys allege that Defendant Wright, in his individual and official capacities, and Defendant Finnegan, in her individual capacity,[9] violated their constitutional rights. The Stanleys categorize these violations as their rights to family integrity, procedural due process, invasion of privacy, freedom of association, and the right to be free from unwarranted seizures and medical exams. Furthermore, the Stanleys allege deprivations of their rights to be free from perjured testimony and fabricated evidence against Defendants Wright and Threadgill, both in their individual and official capacities.[10] They also allege that Defendants Garland County and Sheriff Mike McCormick, in his official capacity, failed to intervene and stop the unwarranted seizures of the children. Lastly, the Stanleys allege *Monell* claims against Garland County.

---

[9] The official capacity claims against Finnegan were dismissed by the Honorable P.K. Holmes III. *See Stanley v. Hutchinson*, 2017 WL 4572496, at *10 (W.D. Ark. June 20, 2017), *aff'd sub nom Stanley v. Finnegan*, 899 F.3d 623 (8th Cir. 2018).

[10] Judge Holmes also ruled that Defendant Finnegan is entitled to qualified immunity with respect to allegations of false testimony. *Id*. at 5.

Each of the individual defendants raise qualified immunity as a defense to these claims. To overcome a defense of qualified immunity at the summary judgment stage, the Stanleys must "assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the [Stanleys], there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right." *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998). Qualified immunity protects officials "who make bad guesses in gray areas, [and] it gives them breathing room to make reasonable but mistaken judgments." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018). However, the protections of qualified immunity do not encompass "the plainly incompetent or those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

## A. Fourteenth Amendment Due Process

The Fourteenth Amendment provides that no state may "deprive any person of life, liberty or property, without due process of law." U.S. CONST. amend. XIV, § 1. The right to due process contains substantive and procedural components. The analysis of a deprivation under either component "must begin with an examination of the interest allegedly violated." *Dover Elevator Co. v. Arkansas State Univ.*, 64 F.3d 442, 445-46 (8th Cir. 1995). The due process interests at stake in this case are the Stanley's liberty interests in keeping their family together, and the procedural protections owed by virtue of the children's removal.

### 1. Substantive Due Process

Parents have a fundamental, constitutionally protected liberty interest in the custody, care, and management of their children. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981); *Manzano v. South Dakota Dep't of Soc. Servs.*, 60 F.3d 505, 509-10 (8th Cir. 1995). The liberty

interest in familial integrity, however, is limited by the government's compelling interest in the protection of minor children. *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 478), *abrogated on other grounds*, *Burns v. Reed*, 500 U.S. 478 (1991). Furthermore, the liberty interest in family integrity does not include the right to remain free from child abuse investigations. *Omni Behavioral Health v. Miller*, 285 F.3d 646, 654 (8th Cir. 2002); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996).

State officials who remove a child from the custody of their parents are entitled to qualified immunity so long as their actions are supported by a reasonable suspicion of child abuse. *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998); *Thomason*, 85 F.3d at 1371; *Manzano*, 60 F.3d at 511. Reasonable suspicion "requires more than a hunch but less than probable cause." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011). "[W]hether there was reasonable suspicion of child abuse warranting removal must be determined by the totality of the circumstances at the time of removal." *Stanley v. Finnegan*, 899 F.3d 623, 629 (8th Cir. 2018). Once reasonable suspicion is present, investigators are not obligated to investigate the matter fully before deciding to remove children from the custody of their parents. *Croft v. Westmoreland County Children and Youth Servs.*, 103 F.3d 1123, 1125-26 (3d Cir. 1997) ("We realize there may be cases in which a child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred."). On the other hand, when a child is removed in the absence of reasonable suspicion, that decision constitutes an arbitrary abuse of government power. *Croft* 103 F.3d at 1126.

Here, the Court finds that Sergeant Wright's decision to remove the children was justified based on the allegations provided by J.S. and V.S. It is undisputed that both children confirmed

the allegations of MMS exposure during their interviews with Finnegan.  The allegations

provided by the children were detailed and substantially similar with the allegations provided by

the original complainants and C.S.[11]  It is also undisputed that both children reported concerns

about the family's potential to flee.  Based on these undisputed facts, a reasonable suspicion of

child abuse existed when the children were removed.  Neither Wright nor Finnegan were

obligated to complete their investigations prior to the removal, such as by interviewing the

parents or the other five children, because J.S. and V.S.'s allegations provided a reasonable basis

to suspect abuse.  *See Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 24 (1st

Cir. 2001) ("The appellant argues that Brown acted unreasonably because he did not investigate

the matter fully … [t]hat argument will not wash.").  Accordingly, Wright and Finnegan are

entitled to qualified immunity as to the removal of the children.

The Stanleys contend the investigators conducted "a sham maltreatment investigation"

after the children were removed on January 12, 2015.  (ECF No. 105, Pls.' Resp., at 1).  On

March 6, 2015, the Arkansas State Police, Crimes Against Children Division ("CACD"), entered

administrative findings of child maltreatment against Hal and Michelle for exposing the children

to poisonous and noxious substances, as well as educational neglect.  CACD submitted

additional findings against Hal for causing a burn on a child's face, striking a child, and causing

a nonaccidental injury.  Later in 2015, the Office of Appeals and Hearings ("OAH") reviewed

CACD's determinations pursuant to the Arkansas Child Maltreatment Act and the Arkansas

---

[11] The Stanleys assert the allegations provided by the original complainants are inadmissible hearsay.  The Court disagrees.  These statements are offered to prove the effect on the listener, Wright, and to explain why he proceeded with the investigation.  *See* Fed. R. Evid. 801; *see also United States v. Davis*, 154 F.3d 772, 778 (8th Cir. 1998).  Further, the Stanleys "dispute that [C.S.] confirmed any abuse" during his interview with Wright and Russell Rhodes.  (ECF No. 105, Pls.' Resp., at 3).  However, the Stanleys fail to provide evidence to support this assertion. *See Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) ("Evidence, not contentions, avoids summary judgment.").

Administrative Procedure Act.  OAH found insufficient evidence of maltreatment and concluded that Hal and Michelle's names should not be placed on the state's child maltreatment registry.

During her deposition for this case, Finnegan stated that she authored CACD's maltreatment findings.  Finnegan revealed that at the time she submitted the findings, she did not actually believe there was enough evidence substantiate her conclusions of abuse and neglect.  (ECF No. 106-1, Finnegan Dep. 47:11-17, 50:20-22, Jan. 31, 2019).  Finnegan insists that she "was made to find true on [the] investigation" due to pressure from one of her superiors, Ron Stayton.  (ECF No. 106-1, Finnegan Dep. 47:1-17, 48:14-15, 50:20-22, Jan. 31, 2019).  According to Finnegan, Stayton pressured her because "the case was too political."  (*Id*. at 47:17).

Although Finnegan's admissions reflect poorly upon CACD and its investigators, her comments do not provide a basis for liability in this case.  The Stanley children were in DHS custody for approximately two months by the time Finnegan submitted CACD's findings.  DHS continued to maintain custody pursuant to family court orders.  The question of whether the children should have remained in DHS custody rested within the sufficiency of the family court's judicial proceedings.[12]  *See, e.g.*, *Southerland v. City of New York*, 680 F.3d 127, 154 (2d Cir. 2012) (only the days prior to the family court's involvement were attributable to the child abuse caseworker).  Despite Finnegan's disclosures, the record does not contain evidence to suggest that her conduct violated the Stanley's rights to familial integrity.

Accordingly, summary judgment is granted as to the Stanley's substantive due process claims.

---

[12] On March 23, 2015, the Honorable Wade Naramore ordered DHS to maintain custody of the children.  Two months later, four of the children permanently returned to the Stanley home.  The remaining children returned on or about June 24, 2015.

## 2. Procedural Due Process

A parent is entitled to the procedural protections of due process when government authorities remove children from their custody. In analyzing a procedural due process claim, the Court must first determine what process is due under the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Courts ordinarily hold "that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original) (collecting cases). But due process is a flexible standard, and government officials can take temporary custody of a child without parental consent or a court order during the presence of emergency circumstances. *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997) (*citing Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)). During situations where a pre-deprivation hearing cannot be provided, a post-deprivation hearing should follow "*as soon as practicable.*" *Goss v. Lopez*, 419 U.S. 565, 582-83 (1975) (emphasis added). "When the state deprives parents and children of their right to familial integrity, even in an emergency situation, without a prior due process hearing, the state has the burden to initiate prompt judicial proceedings to provide a post deprivation hearing." *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1311 (8th Cir. 1997).

On the night the Stanley children were removed from Hal and Michelle's custody, there was no need for law enforcement and investigators to obtain a court order because a

reasonable suspicion of child abuse existed.  *See Heartland Academy Cmty. Church v. Waddle*, 427 F.3d 525, 535 (8th Cir. 2005) (removal of children absent reasonable suspicion or imminent abuse circumvented Fourteenth Amendment requirements of notice and an opportunity to be heard).  It is undisputed that J.S. and V.S. reported allegations of MMS exposure.  It is also undisputed that J.S. and V.S. reported the family would flee if law enforcement did not immediately remove the children from the home. Sergeant Wright's decision to exercise a seventy-two-hour protective hold was reasonable under these circumstances.  After the expiration of the hold period, DHS continued to maintain custody pursuant to a series of family court orders.  A probable cause hearing occurred approximately a week after the children were removed.  In sum, these facts do not present a genuine question as to whether the Stanley's procedural due process rights were violated.  The Court grants summary judgment on the Stanley's procedural due process claims.

## B. Fourth Amendment

The Fourth Amendment, as incorporated by the Fourteenth Amendment, states "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, …"  U.S. CONST., amend. IV. The Stanleys assert Fourth Amendment violations based upon the removal of children, and on the basis that the children underwent medical examinations during and after the search of the home.

### 1. Removal of the Children

The Fourth Amendment "requires that the protective seizure of children occur pursuant to a court order, or, in the absence of a court order, pursuant to probable cause

or exigent circumstances." *Riehm v. Engelking*, 538 F.3d 952, 965 (8th Cir. 2008) (citing *Heartland*, 427 F.3d at 533). "Exigent circumstances" exist when officers or investigators "have reason to believe that life or limb is in immediate jeopardy." *Good v. Dauphin County Soc. Servs. for Children and Youth*, 891 F.2d 1087, 1094 (3d Cir. 1989); *Tenenbaum v. Williams*, 193 F.3d 581, 604-05 (2d Cir. 1999). In the present case, the undisputed material facts establish the presence of exigent circumstances on the night the children were removed. J.S. and V.S. reported allegations of MMS exposure when investigators and law enforcement officials arrived at the Stanley home. The children also reported the family would flee if the children not immediately removed by the investigators. Further, Dr. Esquivel informed Finnegan and Gatlin that the children could be exposed to a variety of serious health issues, such as pulmonary failure, renal failure, or even death, if the MMS allegations were true. Thus, there were sufficient grounds to remove the children without a court order. Summary judgment is granted on the Stanley's Fourth Amendment removal claims.

### 2. Medical Examinations

The Stanleys also claim their Fourth Amendment rights were violated because the children were subjected to medical exams during and after the search of the home. Law enforcement officials did not obtain Hal and Michelle's consent prior to the administration of the exams. It is well-established that exigent circumstances justify a warrantless search when there is a "need to protect or preserve life or avoid serious injury." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (internal quotations and citation omitted). The nature of the allegations in this case were quite serious, and the type of exposure described by J.S. and V.S. could have caused a host of serious medical issues.

The administration of the medical exams was reasonable in light of the possibility the children could have been poisoned.  Summary judgment is, therefore, granted on the Stanley's Fourth Amendment medical examination claims.

**C. First Amendment**

The Stanleys further assert violations of their constitutional rights to freedom of association, a right that is guaranteed by the First and Fourteenth Amendments.  *Hanten v. School Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 233 (1977)).  Freedom of association extends to intimate familial relationships, and it encompasses the "right to associate with others in the pursuit of a wide variety of political, social, economic, *educational, religious*, *and cultural ends*."  *Roberts v. United States Jaycees*, 468 U.S. 609, 619, 622-23 (emphasis added).  However, the right to associate for expressive purposes is not absolute.  *Id*. at 623.  An infringement may be justified by laws and regulations that serve compelling state interests, so long as the restrictions are "unrelated to the suppression of ideas" and "cannot be achieved through means significantly less restrictive."  *Id*.  Based upon the record in this case, the Court has concluded that Wright and Finnegan reasonably believed the children could have been exposed to MMS.  Exposure was a question that could not be determined on an immediate basis during the course of the search.  There is no evidence to suggest that Wright or Finnegan initiated, or recommended, removal for reasons unrelated to the children's safety.  Accordingly, summary judgment is granted on the Stanley's First Amendment claims.

### D. Right to be Free from False Testimony

The Stanleys also allege claims based on the right to be free from false testimony in family court proceedings against Defendants Wright and Threadgill. As noted by this Court, such a right was not clearly established during these proceedings. *See Stanley v. Hutchinson*, 2017 WL 4572496-PKH ("The right to be free from dishonesty of public employees in juvenile court proceedings was not clearly established. To the contrary, it was clearly established that 'witnesses should be immune from civil rights suits alleging perjurious testimony.'") (quoting *Myers v. Bull*, 599 F.2d 863, 866 (8th Cir. 1979)). Thus, Wright and Threadgill are entitled to qualified immunity on these claims.

### E. Governmental Liability

Lastly, the Stanleys assert official capacity claims against Defendants Wright, Threadgill, Lawrence, and McCormick. They also allege *Monell* liability against Garland County, and they assert the County failed to intercede in the unwarranted seizure of the children. Governmental liability under 42 U.S.C. § 1983 must be based on an unconstitutional policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Stanleys have not identified any officially adopted policy. Therefore, the Court looks for an unconstitutional custom. An unconstitutional custom is shown by:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (alterations in original).

The Stanleys contend the investigators in this case have a custom of detaining and removing children without court orders, consent, or exigent circumstances. They also contend the investigators were inadequately trained. The Stanleys, however, fail to present evidence of a "continuing, widespread, persistent pattern of unconstitutional misconduct." *Id*. Even if the Stanley's constitutional rights were violated, they could not rely on this fact alone because liability for an unconstitutional custom "cannot derive from a single act." *McGautha v. Jackson County*, 36 F.3d 53, 57 (8th Cir. 1994). Accordingly, the Court grants summary judgment on the Stanley's governmental liability claims.

## V.      ORDER

IT IS THEREFORE ORDERED that the motions for summary judgment filed by the Defendants (ECF Nos. 89 & 92) are GRANTED. The motion for summary judgment filed by the Plaintiffs (ECF No. 95) is DENIED. The Plaintiffs' claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 20th day of March, 2020.

*/s/ Robert T. Dawson*
**ROBERT T. DAWSON**
**SENIOR U.S. DISTRICT JUDGE**